**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **SEMIR D. SIRAZI and PE CHICAGO, LLC,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 08 C 2345** |
| | ) | |
| **PANDA EXPRESS, INC., PANDA** | ) | |
| **RESTAURANT GROUP, INC., CITADEL** | ) | |
| **PANDA EXPRESS, INC., ANDREW** | ) | |
| **CHERNG, and PEGGY CHERNG,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Semir Sirazi and PE Chicago have sued Panda Express, Panda Restaurant Group (PRG), Citadel Panda Express, Andrew Cherng, and Peggy Cherng.  Plaintiffs assert state law claims for fraud and conspiracy to defraud against all defendants and for unjust enrichment, aiding and abetting breach of fiduciary duty, fraudulent transfer, breach of contract, and breach of fiduciary duty against the corporate defendants (collectively Panda Express).  PRG asserts a counterclaim for breach of contract involving nonpayment of a promissory note.  The Court has jurisdiction based on diversity of citizenship.

Defendants have moved for summary judgment on all claims and on PRG's counterclaim.  Plaintiffs have moved for summary judgment on a portion of their fraudulent transfer claim.  For the reasons stated below, the Court grants defendant's motion in part and denies it in part and denies plaintiffs' motion.

**Background**

A.     **Rezko-Citadel Limited Partnership**

Panda Express operates fast food restaurants specializing in Chinese cuisine.  In 1993, Panda Express entered into an Illinois limited partnership with Rezko Concessions, Inc. (Concessions).  Concessions was controlled by Antoin "Tony" Rezko. Concessions and Panda Express named their partnership Rezko-Citadel Limited Partnership.  The partnership's purpose was to open and manage Panda Express restaurants in the Chicago area and across the Midwest.  Concessions was the general partner, and Panda Express was the limited partner.

In 1998, Concessions's interest in Rezko-Citadel was transferred to PE Chicago, LLC.  PE Chicago became the general partner of Rezko-Citadel.  PE Chicago was wholly owned by Rezko Enterprises, LLC (Enterprises).  Concessions, in turn, was the majority owner of Enterprises.  Tony Rezko still controlled Concessions, Enterprises, and PE Chicago.

Rezko-Citadel was consistently profitable for Rezko and Panda Express, but it did not grow as quickly as anticipated.  In 1997, Rezko-Citadel entered into an Area Development Agreement (ADA) with Panda Express.  The ADA gave Rezko-Citadel the exclusive right to open Panda Express restaurants in shopping malls in Illinois, Wisconsin, Michigan, Iowa, and Indiana, as long as it met development targets.  The development targets required Rezko-Citadel to open eighty stores by December 31, 2002.  Rezko-Citadel failed to meet this goal.  Sirazi asserts that in June 2006, Rezko-Citadel managed only about fifty restaurants.  Sirazi contends that Rezko-Citadel did not expand because Panda Express starved the partnership of capital, used partnership

funds to pay debts that were not attributable to PE Chicago, and opened additional restaurants outside the partnership.

The parties agree, however, that Rezko-Citadel did not grow quickly in part because Rezko's finances were stressed by his attempt to operate a number of Papa John's pizza restaurants. The Papa John's restaurants always lost money and distracted Rezko and other management from the profitable Panda Express business. Indeed, Rezko transferred millions from Rezko-Citadel to himself and his companies to fund the Papa John's business. When Panda Express found out about these unauthorized transfers in 2001, it took over as general partner of Rezko-Citadel so it could control the partnership's accounting and finances. Rezko also borrowed funds from Panda Express for the Papa John's business. By 2006, Rezko and his companies owed more than $6 million to Panda Express, much of which was attributable to the failed pizza business. Panda Express obtained a lien on PE Chicago's interest in Rezko-Citadel to secure Rezko's debts, although the parties dispute whether these debts were properly attributable to PE Chicago.

## B.    Sirazi's investments

Sirazi never had any direct interest in PE Chicago or the Rezko-Citadel partnership. But he did make investments in and loans to Rezko's companies. In August 2000, Sirazi paid $400,000 to purchase warrants in Enterprises. In the same transaction, Sirazi made a $2 million loan to Enterprises. Sirazi could exercise his warrants to obtain an ownership stake in the company, but the warrant agreement also provided that if a "liquidity event" occurred, Enterprises would be required to redeem the shares for a large cash price. Liquidity events included a default on the loan Sirazi had

3

made to Enterprises or a sale by Enterprises or any of its subsidiaries of more than five percent of its assets. At the same time, Sirazi paid $100,000 for similar warrants in Concessions.

In September 2002, Sirazi guaranteed a $1 million loan that a bank offered to Rezko. In exchange for his guarantee, Sirazi received cash payments and ownership interests in Enterprises. Sirazi could receive up to a twelve percent stake in Enterprises, depending on how long the guarantee remained in effect and whether Rezko defaulted. At the same time, Abdelhamid Chaib, a business partner of Rezko, pledged the twenty percent of Concessions stock that he owned as a security for Rezko's performance under the Sirazi-Rezko guarantee agreement.

Defendants claim that Sirazi's investments were used to fund Rezko's struggling Papa John's business. Sirazi disputes this, stating that he was unaware of what the loans were to be used for. He further states that he was willing to risk his money because Enterprises received substantial cash flow from PE Chicago's share of the Panda Express partnership.

The Rezko companies eventually defaulted on all of the agreements they had made with Sirazi. In 2006, Enterprises and Concessions would have had to pay more than $50 million just to redeem the warrants. On August 30, 2006, Sirazi exercised the warrants, which otherwise would have expired on August 31, 2006. After litigation and arbitration with Rezko and Chaib, Sirazi now owns ninety percent of Enterprises directly through the warrants and guarantee and indirectly through the majority ownership of Concessions that he acquired from warrants and Chaib's stock pledge.

Using his ninety percent ownership of Enterprises, Sirazi was able to make

4

himself manager of PE Chicago in 2010.  The parties dispute whether he complied with the requirements of PE Chicago's operating agreement when doing so.

## C.    Buyout of PE Chicago

By 2006, Tony Rezko was facing dire legal and financial threats, and Panda Express wanted to be rid of him as a partner.  Panda Express did not want to face bad publicity from Rezko's legal problems, and it was concerned that he would be distracted from managing their joint business.  Panda Express also feared that it would become involved in Rezko's legal problems; in late 2005 it had been subpoenaed in connection with a criminal investigation involving Rezko.  Def. Resp., Ex. 7 at 168–71.

In May 2006, Rezko contacted R. Michael Wilkinson, Panda Express's counsel, to ask for a $3 million loan.  Rezko needed the money to pay GE Capital, which was about to foreclose on his home because his businesses had defaulted on loans from GE.  Wilkinson brought this request to the Panda Express board, but the board was not interested in loaning more money to Rezko.  Instead, Wilkinson and Rezko agreed that Rezko would sell PE Chicago's fifty percent interest in Rezko-Citadel to Panda Express.

Wilkinson drafted the sale contract, and both parties signed it on June 1, 2006.  Rezko did not have counsel representing him in the transaction, but the contract contained a statement that he had full opportunity to seek the advice of counsel.  Panda Express valued Rezko-Citadel within a day or two by calculating the partnership's earnings before interest, taxes, depreciation, and amortization (EBITDA) and multiplying that figure by six.  It calculated that PE Chicago's fifty percent interest was worth $9,764,228.  Panda Express intended to distribute this money as follows:  $1,875,000 to Manufacturers Bank (MB) to pay off a note signed by PE Chicago and many other

5

Rezko companies and terminate the senior lien associated with the note; $4,687,078 to retire the debt that PE Chicago and the Rezko companies owed to Panda Express; and $3,252,150 to be wired to Rezko's personal bank account. The $3,252,150 was wired to Rezko on June 2, 2006.

Several days later, Panda Express realized it had made two mistakes in calculating the price for PE Chicago's interest in Rezko-Citadel. First, Panda Express found that PE Chicago owed Panda Express about $1.3 million more than it had previously thought, which increased PE Chicago's total debt to Panda Express to $6,010,284. Second, Panda Express discovered that PE Chicago was owed $558,509 in partnership distributions for the first half of 2006. The purchase price of PE Chicago's interest was thus raised to $10,322,737. However, there was insufficient money to cover the cash payment to Rezko, Panda Express's loans, and MB's loan. As a result, Panda Express paid MB only $1,060,303, leaving MB with a lien on Rezko-Citadel for the balance it was owed.

Andrew and Peggy Cherng were co-owners of Panda Express and co-chairs of its board. Although Andrew had been a friend of Rezko since the 1990s, by 2006 both Cherngs wanted to end Panda Express's association with Rezko to protect its brand. Despite this, Andrew wanted to help Rezko if he could, and the Cherngs knew that he needed money. Although neither Cherng negotiated Panda Express's deal with Rezko, Peggy was informed of the deal, reviewed the documentation, and gave final approval.

Rezko asked that the sale contract contain a confidentiality provision and give him a repurchase option. Peggy was aware that Rezko wanted these terms and was told by Tom Davin, a Panda Express executive, that the provisions made no sense

6

because they defeated the purpose of dissociating from Rezko. Nevertheless, the sale contract ended up containing a nondisclosure provision, and it gave PE Chicago the right to repurchase its interest in Rezko-Citadel until July 31, 2007.

Rezko did not use the funds that he had received from the sale of PE Chicago's interest to pay off GE Capital. Defendants claim that he instead wired $3 million to Samir Financial Services, a creditor of Concessions. Plaintiffs admit that Rezko sent $3 million to Samir but dispute that it was the same $3 million that he had received from Panda Express. Plaintiffs also note that it is unclear what happened to the remaining $250,000 of the amount that Panda Express wired to Rezko. It is undisputed that on June 16, 2006, Rezko borrowed an additional $5 million from Samir.

Panda Express eventually paid off the remaining balance on PE Chicago's note to MB, and in return, MB assigned PE Chicago's promissory note to Panda Express. With interest and attorney's fees, the amount due on the note was $858,327.08 at the time that Panda Express paid it. In response to PE Chicago's claims in the first amended complaint, Panda Express demanded payment of the note by PE Chicago. PE Chicago disputes that it is liable on the note.

A federal grand jury indicted Rezko on October 5, 2006, and a jury convicted him on June 4, 2008 on a variety of criminal charges, including mail and wire fraud, aiding and abetting bribery, and money laundering. *United States v. Rezko*, No. 05 CR 691, 2008 WL 4890232, at *1 (N.D. Ill. Nov. 12, 2008).

## Discussion

On a motion for summary judgment, the Court "view[s] the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that

7

party's favor." *Trinity Homes LLC v. Ohio Cas. Ins. Co.*, 629 F.3d 653, 656 (7th Cir.

2010). Summary judgment is appropriate "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). In other words, a court may grant summary judgment

"where the record taken as a whole could not lead a rational trier of fact to find for the

non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

587 (1986). "[I]n ruling on a motion for summary judgment, the judge must view the

evidence presented through the prism of the substantive evidentiary burden." *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

Defendants have moved for summary judgment on all eight of plaintiffs' claims:

(1) fraud; (2) conspiracy to defraud; (3) aiding and abetting the breach of a fiduciary

duty; (4) actual fraudulent transfer; (5) constructive fraudulent transfer; (6) breach of

contract; (7) breach of fiduciary duty; and (8) unjust enrichment. In addition, defendants

Andrew and Peggy Cherng have moved separately for summary judgment on the only

two claims against them: fraud and conspiracy to defraud. Finally, plaintiffs have

moved for summary judgment on their actual fraudulent transfer claim, and defendant

PRG has moved for summary judgment on its promissory note claim.

## A.    Fraud

Plaintiffs contend that defendants committed fraud affirmatively, by stating that

the price they were paying for PE Chicago's interest was fair, and by omission, by failing

to inform Sirazi and PE Chicago of the sale. Defendants argue that they made no

actionable false statement, that they did not conceal anything from PE Chicago, and

that they had no duty to disclose anything to Sirazi. In addition, the Cherngs argue that

8

they played no role in any fraud that occurred.

### 1.    False statements to PE Chicago

To establish a claim for fraud, a plaintiff must prove five elements by clear and convincing evidence.  *Trade Fin. Ptnrs., LLC v. AAR Corp.*, 573 F.3d 401, 413 (7th Cir. 2009).  Defendants contend that plaintiffs cannot establish one of these elements:  that "the defendant made a false statement of material fact."  *Id.*  PE Chicago contends that the defendants made false statements indicating that the price they were paying for PE Chicago's interest in Rezko-Citadel was a fair one.  Defendants argue that they made only a statement of opinion that the price was fair and that statements of opinion are not actionable.

"Ordinarily erroneous statement as to matters of opinion, such as representations of the value of property, do not amount to fraud."  *Wilkinson v. Appleton*, 28 Ill. 2d 184, 188, 190 N.E.2d 727, 720 (1963).  Statements of value made by a seller "are not actionable as fraud."  *Prime Leasing v. Kendig*, 332 Ill. App. 3d 300, 309, 773 N.E.2d 84, 92–93 (2002).

Although PE Chicago notes that defendants were buyers here and not sellers, that fact does not change the analysis.  PE Chicago knew that defendants were on the opposite side of the transaction and had an incentive to get a price that was favorable to them.  If defendants had made a "misrepresentation relate[d] to some specific extrinsic fact materially affecting value," *Wilkinson*, 28 Ill. 2d at 188–89; 190 N.E.2d at 720, that might have been sufficient for fraud, but PE Chicago does not offer evidence that they did.  Rather, PE Chicago contends only that its expert's opinion demonstrates that defendants underpaid by millions of dollars.  Pl. Resp., Ex. P at 1.  The fact that PE

Chicago's expert's opinion differs from Panda Express's valuation of PE Chicago's interest, however, does not make Panda Express's valuation a statement of fact.

PE Chicago also argues that it was entitled to rely on Panda Express's statement regarding the value of Rezko-Citadel because Panda Express was "uniquely situated to examine and determine the valuation of PE Chicago's interest." Pl. Resp. Br. at 10. But PE Chicago was equally a partner in Rezko-Citadel and could have valued its interest; plaintiffs offer no evidence otherwise. Additionally, as stated above, PE Chicago was on the opposite side of the sale from Panda Express and was aware that their interests were adverse.

PE Chicago contends, finally, "that a contract procured by misrepresentation or concealment is especially vulnerable to attack where the party accused of fraud has a confidential relationship toward the injured party." *Wilkinson*, 28 Ill. 2d at 188; 190 N.E.2d at 720. As will be discussed below, however, defendants did not owe PE Chicago a fiduciary duty at the time of the sale.

In sum, defendants are entitled to summary judgment on this claim to the extent it is based on a contention that defendants made false statements of fact to PE Chicago.

### 2. Concealment of the sale from PE Chicago

Although the first amended complaint does not clearly make the claim, in its response brief PE Chicago contends that defendants concealed the sale of PE Chicago's interest in Rezko-Citadel. PE Chicago makes this contention despite the fact that it signed the sale contract. It states that at the time of the sale, PE Chicago was improperly controlled by Tony Rezko, who caused the company to agree to the sale.

10

Only after Sirazi gained control of PE Chicago was it truly aware of the sale, PE Chicago contends.

PE Chicago bases its argument upon *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995). In that case, Douglas used three corporations to run a Ponzi scheme. *Id.* at 752. After the fraud was discovered, Scholes, the receiver for the corporations, attempted to recover money for creditors that the corporations had given to the defendants. *Id.* at 753. Scholes argued that the transactions were fraudulent conveyances. As a receiver, Scholes could only sue on behalf of the corporations. The defendants argued that the corporations could not seek to unwind the fraudulent conveyances because they themselves had made the conveyances. *Id.* at 753–54. The Seventh Circuit reasoned that Douglas had harmed the corporations by removing money from them and not using it for proper corporate purposes. *Id.* at 754. The corporations were not able to complain about this, however, until Douglas had been ousted from control and a receiver had been appointed. *Id.* The court also recognized that unwinding the fraudulent conveyances would benefit creditors, and not Douglas, because a receiver had been appointed. *Id.* Thus, the court concluded, there was no need to apply the rule that the makers of fraudulent conveyances cannot unwind them. *Id.* For these reasons, the court held that Scholes had standing to bring fraudulent conveyance claims on behalf of the corporations. *Id.* at 753–54.

Here, PE Chicago attempts to use *Scholes*'s decision on standing to argue that it need not meet the concealment requirement of a fraudulent concealment claim. PE Chicago essentially argues that even though PE Chicago as an entity indisputably knew of the sale at the time, that knowledge does not count, because it is now under new

11

management and its current management did not know of the sale. But *Scholes* does not stand for the proposition that all actions taken by any former management of a company have no effect once new management is in place. Nor does it stand for the proposition that then-unknown future management of a company must be made aware of all current transactions.

In sum, no reasonable jury could find actionable concealment of the sale from PE Chicago, because it was a party to the transaction.

### 3.     Concealment from Sirazi

Sirazi contends that defendants concealed the sale of PE Chicago's interest from him even though they were aware of his investments in Concessions and Enterprises. Defendants argue that the failure to inform Sirazi of the sale cannot support a fraud claim because they had no duty to tell him. "In Illinois, in order to prove fraud by the intentional concealment of a material fact, it is necessary to show the existence of a special or fiduciary relationship, which would raise a duty to speak." *Neptuno Treuhand-Und Verwaltungsgesellschaft MBH v. Arbor*, 295 Ill. App. 3d 567, 573, 692 N.E.2d 812, 817 (1998).

Sirazi argues that there can be a fiduciary relationship between creditor and debtor that gives rise to a duty to disclose. Generally a debtor-creditor relationship is not a fiduciary relationship, but it can be in certain circumstances. *See Magna Bank of Madison v. Jameson*, 237 Ill. App. 3d 614, 618, 604 N.E.2d 541, 544 (1992) (recognizing that creditor-guarantor relationship can be fiduciary).

Sirazi has the burden of proving a fiduciary relationship by clear and convincing evidence. *Id.*

12

> [T]he party seeking to prove a fiduciary relationship must show that he
> placed trust and confidence in the other so that the latter gained influence
> and superiority over him. The degree of trust and confidence can be
> established by the following factors: degree of kinship, age disparity,
> health, mental condition, education, business experience between the
> parties, and the extent of the reliance.

*Id.* at 618–19, 604 N.E.2d at 544 (citations omitted). Sirazi provides no evidence that any of these factors led him to place trust and confidence in Panda Express. Thus no reasonable jury could conclude that Panda Express had a duty to disclose to Sirazi as a creditor.

Sirazi also contends that Panda Express had a duty to disclose the sale to him as an owner of PE Chicago. Panda Express argues that Sirazi was not an owner of PE Chicago but rather was only a creditor of Concessions and Enterprises. Whether Sirazi may be considered to have been an owner of PE Chicago at the time depends on whether he was an owner or just a creditor of Enterprises and Concessions and on whether Enterprises and Concessions were alter egos of their subsidiary PE Chicago.

Sirazi obtained his claimed ownership interests in Concessions and Enterprises from four different transactions: (1) a twenty percent stake in Concessions from the shares that Abdelhamid Chaib pledged to him; (2) a twelve percent interest in Enterprises in return for the guarantee he provided Rezko; (3) a 54.48 percent interest in Concessions from exercise of his warrants; and (4) a 67.96 percent interest in Enterprises from exercise of his warrants.

As indicated earlier, Chaib pledged his twenty percent interest in Concessions to Sirazi in 2002 as security for the loan guarantee that Sirazi provided to Rezko. The pledge agreement required Chaib to immediately transfer his shares in Concessions to

13

Sirazi and endorse them for transfer. Pl. Ex. 12 ¶ 1. During his deposition, Chaib testified that he had done so. Pl. Ex. 13 at 61, 66–67. The pledge agreement allowed Sirazi to register the shares in his own name or sell them without notice to Chaib as soon as a default occurred. Pl. Ex. 12 ¶ 5(a)–(b). Sirazi testified in a deposition that Rezko defaulted on January 17, 2003, long before the June 1, 2006 sale of PE Chicago's interest. Def. Ex. 8 at 79. Sirazi contends that in November 2003 the twenty percent stake in Concessions, which was the majority owner of Enterprises, meant that he indirectly owned seventeen percent of Enterprises.

Sirazi also became entitled to twelve percent of Enterprises through the guarantee that he provided Rezko in 2002. The guarantee agreement provided that Sirazi was entitled to various ownership shares of Enterprises for each month that the guarantee was in effect and for each month that Rezko was in default on the guarantee agreement. Pl. Ex. 11 ¶ 3. The agreement also required Concessions to transfer the membership interest to Sirazi within fifteen days after it was earned. *Id.* Sirazi became entitled to twelve percent of Enterprises, the maximum allowed under the agreement, by November 17, 2003.

Defendants argue that Rezko did not recognize Sirazi's rights in Enterprises and Concessions and that Sirazi had to sue to enforce them. A state court judgment entered on December 18, 2007 directed Rezko and Chaib to transfer to Sirazi within twenty-eight days the ownership interests to which he was entitled. Pl. Ex. 14. Defendants contend that Sirazi could not have been an owner of Concessions and Enterprises at the time of PE Chicago's sale if a court had to direct that he be given his ownership interests more than eighteen months later. But a reasonable jury could find

14

that Sirazi was already an owner and that the state court judgment was meant only to force a recalcitrant Rezko to formally recognize Sirazi's ownership. Sirazi claims that because of the twelve percent he earned from the guarantee and the seventeen percent he effectively owned through the pledge of shares in Concessions, he controlled twenty-nine percent of Enterprises by the end of 2003. A reasonable jury could agree.

The remainder of Sirazi's claimed ownership interests in Concessions and Enterprises derives from the warrants. The warrants, however, did not give Sirazi any ownership rights until he exercised them. Pl. Ex. 9 ¶ 6; Compl., Ex. 3 ¶ 5; *see Aspen Advisors LLC v. UA Theatre Co.*, 861 A.2d 1251, 1262–63 (Del. 2004). Sirazi did not exercise the warrants until August 30, 2006, after the sale of PE Chicago's interest in Rezko-Citadel. He argues that the sale was a liquidity event that required Enterprises and Concessions to provide him with notice and redeem the warrants. Pl. Ex. 9 ¶ 5(vii); Compl., Ex. 3 ¶ 4(vii). Redemption, however, meant only that Enterprises and Concession would pay Sirazi cash in exchange for the warrants. Pl. Ex. 9 ¶ 2; Compl., Ex. 3 ¶ 2. If the companies did not do so, Sirazi's could "pursue all remedies available to him at law or in equity or exercise the Warrants." Pl. Ex. 9 ¶ 5. The failure of Concessions and Enterprises to redeem the warrants from Sirazi did not make him an owner of the companies until he chose to exercise the warrants.

Sirazi seems to argue further that he would have exercised the warrants if he had been notified about the impending sale of PE Chicago's interest. But the warrant agreements did not require that Enterprises and Concessions give Sirazi notice of a liquidity event if one occurred.

In sum, before exercise of the warrants, Sirazi did not have the rights of a

15

shareholder or member. *Id.* ¶ 6; Compl., Ex. 3 ¶ 5. Sirazi was only a creditor of

Enterprises and Concessions, and, as discussed above, there was no duty to disclose

the liquidity event to him. *See Magna Bank*, 237 Ill. App. 3d at 618–19; 604 N.E.2d at

544. For these reasons, no reasonable jury could find that Sirazi had an ownership

interest through his warrants at the time of the PE Chicago sale.

Sirazi also argues that at the time he exercised his warrants, there was still an

option to repurchase PE Chicago's interest in Rezko-Citadel, but defendants concealed

its existence from him. But the repurchase option could be exercised only by Rezko "or

an[ ] entity Antoin Rezko controls and will continue to control indefinitely following said

repurchase." Compl., Ex. 15 ¶ 6. Thus, Sirazi could not have exercised the option even

had he known of its existence. Thus he cannot show fraudulent concealment at the

time that he exercised the warrants. *Neptuno*, 295 Ill. App. 3d at 572, 692 N.E.2d at

817.

In sum, a reasonable jury could find that Sirazi was an owner of Concessions

and Enterprises through the guarantee agreement and the share pledge, but not via the

warrants.

Sirazi contends that he should be considered to have been an owner of PE

Chicago (and thus entitled to notice of the sale) because an ownership interest in

Concessions and Enterprises effectively amounted to an ownership interest in PE

Chicago. He argues, in effect, that he can "pierce the corporate veil" between

Concessions, an Illinois corporation; Enterprises, a Delaware LLC; and PE Chicago,

also a Delaware LLC.

Piercing the corporate veil is not a simple matter under either Illinois or Delaware

16

law. *Aps Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 628 (7th Cir. 2002) ("Limited liability will ordinarily exist even though the corporation is closely held or has a single shareholder." (internal quotation marks omitted)); *Wallace v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999) ("Persuading a Delaware court to disregard the corporate entity is a difficult task." (internal quotation marks omitted)); *see West Coast Opportunity Fund, LLC v. Credit Suisse Sec. (USA), LLC*, 12 A.3d 1128, 1129–30, 1132 (Del. 2010) (considering whether to pierce the "corporate" veil of an LLC and citing authority dealing with corporations). Under Delaware law, piercing the corporate veil requires evidence that "demonstrate[s] the Officers' and/or Parents' complete domination and control . . . . The degree of control required to pierce the veil is exclusive domination and control to the point that [the corporation] no longer has legal or independent significance of its own." *Wallace*, 752 A.2d at 1183–84 (ellipses and brackets in original and internal quotation marks omitted). Under Illinois law, a plaintiff must show that there is a unity of interest and ownership such that the two entities do not have separate personalities and that continuing to recognize "the fiction of separate corporate existence would likely produce an unjust or inequitable result." *Aps Sports Collectibles*, 299 F.3d at 631.

Concessions owned the majority of Enterprises, and Enterprises in turn owned all of PE Chicago. Although "a mere parent-subsidiary relationship" does not make two entities alter-egos, Sirazi has presented evidence from which a reasonable jury could find that all three corporations were alter egos. *Zurich Am. Ins. Co. v. Watts Indus.*, 417 F.3d 682, 688 (7th Cir. 2005) (internal quotation marks omitted). There is evidence that would allow a reasonable jury to find that Rezko and Panda Express made no

17

distinction between Rezko and his companies. Defendants state that money from the sale of PE Chicago's interest was wired to Rezko's personal bank account because PE Chicago had no bank account at all. Panda Express knew that Rezko wanted to receive cash from the sale so that he could protect his house from foreclosure by paying off business loans to all of his companies. Defendants also admit that Rezko was the only decision maker for all three companies throughout the entire time that Rezko and Panda Express did business.

Additionally, there is evidence from which a reasonable jury could find that Panda Express and Rezko did not distinguish among Concessions, Enterprises, and PE Chicago. To defend themselves from plaintiffs' fraudulent transfer claims, defendants state that the money Rezko received from Panda Express never went to PE Chicago or even Enterprises but was instead used to pay off debts to Concessions. A reasonable jury could find that if it was proper to sell off the assets of PE Chicago to pay debts owed by Concessions, then it makes little sense to treat ownership of Concessions as distinct from ownership of PE Chicago.

Further, PE Chicago ended up being responsible for the debts of other parts of Rezko's businesses. At the time of the sale of the interest in Rezko-Citadel, Panda Express required PE Chicago to satisfy more than $6 million in debt from Rezko's Papa John's business. Pl. Resp., Ex. C. Even the sale contract between Panda Express and Rezko did not differentiate between the various Rezko controlled companies. The contract referred to Rezko, Concessions, Enterprises, and PE Chicago collectively as "REZKO," and stated that REZKO owed fifty percent of Rezko-Citadel. Compl., Ex. 15 at 1. The contract does not recognize that PE Chicago was an actual owner of Rezko-

18

Citadel, and in fact PE Chicago's name is not even mentioned in the contract but rather is only printed on the signatory page. *Id.* at 4. The evidence would allow a reasonable jury to conclude that Rezko and Panda Express did not distinguish between the three companies and did not ascribe any significance to their separate legal existence.

In conclusion, a reasonable jury could find that Sirazi was an owner of Concessions and Enterprises at the time of the sale of PE Chicago's interest in Rezko-Citadel and that Concessions, Enterprises, and PE Chicago were all alter egos of each other. As a result, the Court denies summary judgment on the fraud claim to the extent it is based on the failure to disclose to Sirazi the sale of PE Chicago's interest in Rezko-Citadel.

### 4. The Cherngs' summary judgment motion

Andrew and Peggy Cherng contend that there is no evidence that would permit a reasonable jury to find by clear and convincing evidence that they committed fraud. An officer or director of a corporation is not always liable for fraud by the corporation. *People ex. rel. Hartigan v. E&E Hauling, Inc.*, 153 Ill. 2d 473, 502, 607 N.E.2d 165, 179 (1992). But an officer or director is liable if he or she "with knowledge, or recklessly without it, participates or assists in the fraud." *Id.* (internal quotation marks omitted).

The only fraud claim against the corporate defendants that survives summary judgment is Sirazi's fraudulent concealment claim based on the failure to disclose the sale of PE Chicago's interest in Rezko-Citadel. The Cherngs contend that even though they entered into a transaction with Rezko, that transaction was not intended to defraud Sirazi. On a fraudulent concealment claim, the plaintiff must prove that the defendant's "concealment was intended to induce a false belief, under circumstances creating a

19

duty to speak." *Neptuno*, 295 Ill. App. 3d at 572, 692 N.E.2d at 816 (internal quotation marks omitted).

There is evidence from which a reasonable jury could conclude that the Cherngs knowingly participated in fraudulently hiding the sale of PE Chicago's interest from Sirazi and other investors. Drawing reasonable inferences in favor of Sirazi, there is evidence that the Cherngs knew that Rezko wanted to meet with someone from Panda Express in May 2006. Pl. Resp., Ex. T at 71. Both Cherngs talked with other officers of Panda Express about the necessity of ending ties to Rezko. *Id.*, Exs. R at 91 & S at 85–86. During his deposition, Andrew stated that he wanted to help out Rezko because he liked him. *Id.*, Ex. S at 85. He also stated that in a large deal like the purchase of PE Chicago's interest, he and Peggy would be involved and the officers of the company would seek his approval. *Id.*, Ex. S at 86. Peggy told her negotiating team to be fair and reviewed the sales documents. *Id.*, Ex. R at 92–93, 96. Peggy was aware that Rezko wanted a nondisclosure clause in the sale agreement, and that such a clause ended up in the final agreement. *Id.*, Ex. R at 94. When another Panda Express executive told Peggy that he thought including a nondisclosure agreement defeated the entire purpose of dissociating from Rezko, Peggy told him that "[w]e want to take care of Tony." *Id.*, Ex. U at 58–59.

A reasonable jury could find that the Cherngs participated in the fraudulent concealment of the sale from Sirazi because they were involved in the deal, wanted to help Rezko, and agreed to a nondisclosure agreement.

## B.   Conspiracy to defraud

Defendants argue that plaintiffs' conspiracy to defraud claims fail because the

20

underlying fraud claims fail.  *See Ill. Non-Profit Risk Mgmt. Ass'n v. Human Serv. Ctr.*, 378 Ill. App. 3d 713, 724, 884 N.E.2d 700, 711 (2008).  Because the Court denies summary judgment on Sirazi's fraudulent concealment claim, the Court also denies summary judgment on the conspiracy to defraud claim to the extent that it relates to Sirazi's fraudulent concealment claim.

The Cherngs also argue that there is no evidence that they entered into an agreement with anyone.  Sirazi's fraud claim is based on the contention that Panda Express had a duty to tell him of the sale and did not.  As discussed above, a reasonable jury could conclude that the Cherngs agreed on behalf of Panda Express to buy PE Chicago's interest from Rezko and agreed to not disclose that they had done so.  There is evidence that a reasonable jury could use to conclude that both Andrew and Peggy Cherng reviewed or approved the terms of the deal and wanted to help Rezko.  Because a jury could conclude that the Cherngs agreed to the sale and agreed not to tell anyone, the Court declines to enter summary judgment in favor of the Cherngs on this claim.

## C.     Aiding and abetting breach of fiduciary duty

Sirazi claims the defendants aided and abetted Rezko and Chaib in breaching their fiduciary duties to owners and creditors of PE Chicago and Enterprises. Defendants contend that Sirazi was not an owner of either PE Chicago or Enterprises; he was not a creditor of PE Chicago; Sirazi could not make a claim for breach of fiduciary duty against Enterprises's officers as a creditor; PE Chicago and Enterprises's operating agreements disclaimed fiduciary duties; and officers of Enterprises did not breach a fiduciary duty because they did not sell PE Chicago's interest.

21

Defendants contend that PE Chicago and Enterprises do not owe fiduciary duties to their creditors, and Sirazi does not argue otherwise. Accordingly, for the claim against PE Chicago to succeed, Sirazi must have had an ownership interest in Enterprises such that he was owed a fiduciary duty, and PE Chicago must have been Enterprises's alter ego. For the claim against Enterprises to succeed, Sirazi must have been an owner of Enterprises, and Enterprises's officers must have participated in the sale.

Defendants argue that Enterprises's officers did not participate in the sale because Enterprises and PE Chicago are separate entities. As discussed above, however, there are genuine issues of fact regarding whether Enterprises and PE were alter egos. There are also genuine issues of fact regarding whether Sirazi was an owner of Enterprises at the time of the sale. Summary judgment on this claim is thus appropriate only if PE Chicago and Enterprises disclaimed all fiduciary duties.

A Delaware LLC can, by contract, entirely eliminate fiduciary duties. Del. Code Ann. tit. 6 § 18-1101(c); *ABRY Partners V, L.P. v. F&W Acquisition LLC*, 891 A.2d 1032, 1063 (Del. Ch. 2006). PE Chicago and Enterprises's operating agreements contained nearly identical clauses regarding manager liability. PE Chicago's operating agreement states:

> 6.08 Liability of a Manager. A Manager and any Affiliate of a Manager, and their respective officers, shareholders, controlling persons, directors, agents and employees, shall not be liable, responsible or accountable in damages or otherwise to the Company or to any of the Members, their successors or permitted assigns, except by reason of acts or omissions due to gross negligence or willful misconduct. Any action taken in good faith in reliance upon and in accordance with the advice or opinion of counsel shall be conclusively deemed not to constitute gross negligence or willful misconduct.

Def. Ex. 15 ¶ 6.08. Enterprises's operating agreement is the same, except that it begins as follows: "6.08 Liability of *the* Manager. *The* Manager and any Affiliate of *the* Manager." Def. Ex. 17 ¶ 6.08 (emphasis added). On their face, these clauses seem to allow claims based on willful misconduct. Sirazi claims that Rezko and Chaib, as officers of PE Chicago and Enterprises, deliberately transferred PE Chicago's interest in Rezko-Citadel for less than it was worth and deliberately retained the proceeds of the sale. This claim is not disclaimed by the operating agreements.

Defendants cite the case of *Fisk Ventures, LLC v. Segal*, No. 3017-CC, 2008 WL 1961156 (Del. Ch. May 7, 2008) (unpublished), in which they contend the court decided that a similar provision in an operating agreement eliminated fiduciary duties. In that case, the operating agreement provided:

> *Performance of Duties; no Liability of Officers*. No Member shall have any duty to any Member of the Company except as expressly set forth herein or in other written agreements. No Member, Representative, or Officer of the Company shall be liable to the Company or to any Member for any loss or damage sustained by the Company or to any Member, unless the loss or damage shall have been the result of gross negligence, fraud or intentional misconduct by the Member, Representative, or Officer in question.

*Id.* at *9 (internal quotation marks omitted). The court appears to have reasoned, in the alternative, that because the operating agreement expressly eliminated all duties and provided only a narrow exception, there were no fiduciary duties at all. *Id.* at 11. The operating agreements in the current case, by contrast, do not broadly eliminate all duties. Rather, they state only that officers of the LLCs cannot be liable for negligence. The entire first sentence of the clause from the *Fisk* case is missing here. The Court denies summary judgment on this claim.

23

**D.    Actual fraudulent transfer**

Sirazi and PE Chicago contend that Rezko transferred PE Chicago's fifty percent interest in Rezko-Citadel with the intent to delay, hinder, or defraud creditors. *See* 740 ILCS 160/5(a)(1). Panda Express makes three arguments in support of its contention that it is entitled to summary judgment. First, it argues that Sirazi was not a creditor of PE Express and cannot make a claim. Second, it argues that the transfer was not fraudulent. Finally, it argues that PE Chicago cannot bring a fraudulent transfer claim because it was a party to the transaction and because the limitations period has expired. Plaintiffs also move for summary judgment in their favor on this claim, contending that there is no genuine issue of material fact that the transfer was fraudulent and that Panda Express lacked good faith.

**1.    Sirazi's fraudulent transfer claim**

Defendants state that because Sirazi was a creditor of Enterprises and Concessions, not PE Chicago, he cannot bring a fraudulent transfer claim because the claim requires a "debtor/creditor relationship." *A.P. Props. v. Goshinsky*, 186 Ill. 2d 524, 529, 714 N.E.2d 519, 522 (1999); *see Aps Sports Collectibles*, 299 F.3d at 629–31 (rejecting fraudulent transfer claim that sought to recover from insiders of the debtor when there was no basis for piercing the corporate veil). As discussed above, however, a reasonable jury could find that the three entities were alter egos and that as a result, the debts that Enterprises and Concessions owed to Sirazi were effectively also owed by PE Chicago.

Defendants also contend that Sirazi's claim fails because Rezko used the proceeds from the sale of PE Chicago's interest to pay off creditors such as MB, Samir

24

Financial Services, and Panda Express itself. They argue that preferring some creditors over others does not constitute fraudulent transfer. Under Illinois law, "[a] debtor may prefer one creditor to another provided such preference is made in good faith with the intent to pay or secure the payment of a just indebtedness against him." *Schacht v. Katten Muchin & Zavis (In re MedCare HMO)*, 294 Ill. App. 3d 42, 52, 689 N.E.2d 374, 381 (1997).

Defendants' argument, however, focuses on the wrong transaction. Their argument provides a reason why Rezko's transfer of the proceeds of the sale to some of his creditors was not fraudulent. Sirazi's claim, however, is focused not on the transfer of the sale proceeds, but on the sale of PE Chicago's interest itself. Sirazi contends that sale was made hastily because Rezko was under pressure and that it was for much less than market value.

The Court denies defendant's motion for summary judgment on this claim.

## 2. Plaintiffs' motion for summary judgment

Plaintiffs also move for summary judgment on their actual fraudulent transfer claim, arguing that it is undisputed that the sale of PE Chicago's interest was made to hinder creditors and that Panda Express acquired the interest without good faith and without providing reasonably equivalent value. *See* 740 ILCS 160/5(a)(1), 160/9(a). As discussed earlier, there is a genuine factual dispute regarding whether Sirazi was a creditor of PE Chicago who is entitled to bring a fraudulent transfer claim.

Additionally, there are genuine issues of fact regarding whether the transfer was fraudulent. The fraudulent transfer statute provides eleven factors that can be considered when determining actual fraudulent intent:

25

(1) the transfer or obligation was to an insider;
(2) the debtor retained possession or control of the property transferred after the transfer;
(3) the transfer or obligation was disclosed or concealed;
(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(5) the transfer was of substantially all the debtor's assets;
(6) the debtor absconded;
(7) the debtor removed or concealed assets;
(8) the value of consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

740 ILCS 160/5(b). These eleven "badges of fraud" are merely considerations; a majority of them need not be present to find fraudulent intent. *Brandon v. Anesthesia & Pain Mgmt. Assocs.*, 419 F.3d 594, 599–600 (7th Cir. 2005).

It is undisputed that PE Chicago was insolvent after the sale of its interest in Rezko-Citadel and that the partnership interest was the only asset that PE Chicago possessed. It is also undisputed that the sale contract included a nondisclosure clause, and thus the transfer was concealed. But there is a genuine issue of fact regarding what happened to the proceeds of the sale. Panda Express presents evidence that the money was paid to creditors of the Rezko companies rather than to Rezko personally. Def. Ex. 5 at 5–7. If the proceeds of the sale were all used to pay creditors, that fact would suggest that Rezko did not remove, conceal, or abscond with the assets of PE Chicago.

Further, a reasonable jury could find that the price that Panda Express paid for

26

PE Chicago's interest was reasonably equivalent to its value. Plaintiffs argue that in 2000, there were two valuations of Rezko-Citadel; one valued PE Chicago's interest at $14 million, and the other valued the interest at more than $21 million. But defendants dispute that these estimates were accurate, and in 2000 it might not yet have been apparent that Rezko-Citadel would not grow as had been projected in the development agreement that it and Panda Express had signed in 1997. During this litigation, plaintiffs' expert has valued PE Chicago's interest at $18–19 million, and defendants' expert has valued the interest at $9–11 million. Pl. Resp., Ex. P at 28; Def. Resp., Ex. 8 at 16.

In sum, there are disputed issues of material fact regarding whether Rezko paid creditors with the proceeds of the sale and whether the sale price was fair. The Court concludes that a reasonable jury could find that the sale of PE Chicago's interest was not done with the intent to hinder, delay, or defraud any creditor.

### 3.  PE Chicago's fraudulent transfer claim

Defendants argue that PE Chicago cannot assert a fraudulent transfer claim because it was a party to the allegedly fraudulent transaction. Generally parties to a transaction cannot seek to unwind it by arguing that the transaction was fraudulent. But in *Scholes*, as discussed above, the Seventh Circuit created an exception to that rule in a case in which a corporation made a fraudulent transfer but the person who caused that transfer had lost all beneficial interest in the corporation. In that situation, the court concluded that a receiver could seek to unwind fraudulent transfer claims when the parties who would benefit were creditors and not those who caused the fraudulent transfer to be made. *Scholes*, 56 F.3d at 754. Although PE Express is not in

27

receivership like the corporations in *Scholes*, it might fit into the exception because Rezko, who caused PE Express to sell its interest in Rezko-Citadel, no longer has a controlling interest in the company because Sirazi has taken over.

The Court does not decide, however, whether *Scholes* should be extended to cover PE Chicago's situation. Assuming PE Chicago may bring an actual fraudulent transfer claim, the claim is time-barred. A claim of actual fraudulent transfer must be brought within four years after the transfer was made, "or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant." 740 ILCS 160/10(a).

The sale of PE Chicago's interest occurred on June 1, 2006. PE Chicago did not move to amend the complaint to make its claim until July 22, 2010 and did not file the amended complaint until November 10, 2010. Thus it did not make the claim within four years of the challenged transfer.

Sirazi contends that he did not take control of PE Chicago until 2010 and it was only then that PE Chicago was properly aware of the transaction and could make a claim to reverse it. But Sirazi's ownership of Enterprises, and thus his indirect control of PE Chicago, was established earlier. A state court ordered Chaib and Rezko to give Sirazi the interests that he had earned in Concessions and Enterprises through his guarantee and the stock pledge on December 18, 2007. Pl. Ex. 14. Sirazi acquired additional interests in Enterprises and Concessions through the exercise of his warrants, and those interests were recognized in arbitration on December 1, 2008 and by a court judgment confirming the arbitration on June 26, 2009. Pl. Ex. 15.

By June 26, 2009, more than a year before plaintiffs sought to amend the

28

complaint to add PE Chicago's claim, Sirazi owned ninety percent of Enterprises directly and indirectly and was in a position to cause PE Express to bring a fraudulent transfer claim. Further, both PE Express and Sirazi knew of the allegedly fraudulent transfer earlier. Sirazi filed his initial complaint against defendants alleging fraudulent transfer on April 24, 2008. Even accepting plaintiffs' argument that PE Chicago did not "know" of the transaction until Sirazi had control of it, PE Chicago's fraudulent transfer claim is time-barred.

### E.    Constructive fraudulent transfer

Plaintiffs contend that the sale of PE Chicago's interest was also constructive fraud. Defendants argue that this claim fails for the same reason as the actual fraudulent transfer claim.

The Court denies defendants' motion for summary judgment on this claim for the same reasons for which it denied summary judgment on Sirazi's actual fraudulent transfer claim. The Court grants summary judgment in favor of defendants on PE Chicago's constructive fraudulent transfer claim because the claim was filed more than four years after the sale of PE Chicago's interest and there is no provision for constructive fraud claims that provides for a later starting date for the limitations period. 740 ILCS 150/10(b).

### F.    Breach of contract

PE Chicago contends that Panda Express breached the Rezko-Citadel Limited Partnership Agreement by failing to distribute the profits of the partnership equally and by failing to assign a fair market value to PE Chicago's partnership interest. Defendants argue that Panda Express properly distributed the profits of the partnership and had no

29

obligation to assign a fair market value to PE Chicago's interest.

### 1.     Division of profits

Defendants contend that the partnership agreement required that PE Chicago's share of the partnership's profits be used to pay off the debts that it and its affiliates owed to the partnership before any profits were distributed to PE Chicago. Defendants cite a provision of the agreement dealing with dissolution and windup of the partnership. The provision states that any debts of a partner or its affiliates must be accounted for when distributing the property of the partnership during liquidation. Compl., Ex. 14 § 13.2(c). Section 13.2(c), however, does not address distributions of profits and cash flow during the time that the partnership is operating. On that score, the agreement states that profits and net cash flow will be split equally. *Id.* §§ 3.1, 4.1. Given the lack of contractual language allowing Panda Express to take PE Chicago's distributions to pay back PE Chicago's debts, a reasonable jury could find that defendants breached the partnership agreement.

### 2.     Price of PE Chicago's interest

Defendants argue that they had no duty under the Rezko-Citadel partnership agreement to assign a fair price to PE Chicago's partnership interest. The agreement provided that Panda Express had a right to buy PE Chicago's interest for its "Fair Market Value." *Id.* § 10.1. Fair market value was defined in the agreement as "the cash price that a willing buyer would pay to a willing seller when neither is acting under compulsion and when both have reasonable knowledge of the relevant facts." *Id.* The agreement further stated that "[i]f the parties have not agreed on such Fair Market Value within 30 days . . . , Fair Market Value shall be determined by appraisal." *Id.*

Although the agreement defined fair market value, it also gave the partners the first chance to agree to a fair market value. The agreement provided for a detailed appraisal process, but only if the parties do not reach an agreement on price within thirty days. *Id.* § 10.1(a). Here the parties did agree to a fair market value, and Panda Express made the purchase.

PE Chicago's claim is essentially that it no longer thinks that the price represents fair market value, no doubt because it is now controlled by Sirazi rather than Rezko. But this reading of the contract would mean that both PE Chicago and Panda Express breached the contract, because they agreed to what they considered at the time to be a fair price. It is true that Panda Express did not conduct an appraisal to determine the fair market value of PE Chicago's interest. The contract, however, specifically dictated that an appraisal would take place only if the parties could not agree on a price. PE Chicago and Panda Express did not breach the agreement by agreeing to a fair market value for the purchase of PE Chicago's interest.

For these reasons, the court grants summary judgment in favor of defendants on PE Chicago's breach of contract claim as it relates to fair market value.

## G. Breach of fiduciary duty

PE Chicago contends that Panda Express violated a fiduciary duty it owed to PE Chicago by paying a low price for PE Chicago's interest, failing to invest capital into the partnership, and opening Panda Express restaurants outside of the partnership. Defendants respond that Panda Express did not owe fiduciary duties to PE Chicago at the time of the sale and that the other alleged violations were actions permitted by the partnership agreement.

### 1. Sale of PE Chicago's interest

Defendants argue that even though partners typically owe each other fiduciary duties under Illinois law, those duties cease to exist once the partnership has been dissolved and the partners have adverse interests. Though partners are normally fiduciaries of each other, that relationship ends when the partnership is dissolved. *Hamilton v. Williams*, 214 Ill. App. 3d 230, 247, 573 N.E.2d 1276, 1288 (1991). "The partnership relationship does not extend to all affairs and transactions between the partners . . . and when the partners have entered into an arm's length transaction in order to effect dissolution, their relationship is not fiduciary in nature." *Id.* at 247–48, 573 N.E.2d at 1288 (citation omitted). In *Hamilton*, limited partners of a partnership resigned and then signed a letter of intent with the managing partner specifying how the partnership would be dissolved. *Id.* at 233, 573 N.E.2d at 1278. The court concluded that the managing partner did not owe a fiduciary duty to the limited partners. *Id.* at 247–48, 573 N.E.2d at 1288. Similarly, in *Babray v. Carlino*, 2 Ill. App. 3d 241, 276 N.E.2d 435 (1971), partners did not owe each other fiduciary duties when they agreed to dissolve the partnership and signed a written agreement specifying how dissolution would occur, because they dealt with each other at arm's length. *Id.* at 251, 276 N.E.2d at 442.

Here, PE Chicago and Panda Express agreed to dissolve their partnership when they agreed that Panda Express would buy out PE Chicago's interest in Rezko-Citadel. At that point, the only remaining matter was the price that Panda Express would pay. Because the sale would terminate the partnership and the parties had directly adverse interests, Panda Express did not owe a fiduciary duty to PE Chicago at the time the sale

was negotiated and carried out.  Thus Panda Express could not have breached a fiduciary duty by offering PE Chicago a low price or by taking advantage of Rezko's financial distress to obtain a low price.

### 2.    Investing in the partnership

PE Chicago contends that Panda Express starved the Rezko-Citadel partnership of capital by not investing its own money in the partnership and by shutting down a credit line that PE Chicago had.  Defendants argue that they had no obligation to invest further capital in the partnership.

Under Illinois law, a limited partnership agreement may not eliminate or reduce fiduciary duties, but it may "identify specific types or categories of activities that do not violate the duties."  805 ILCS 215/110(b)(5)(A).  The Rezko-Citadel partnership agreement stated that "[e]ach Partner may (but is not required to) contribute from time to time such additional money or other property as the Partners may agree in writing."  Compl., Ex. 14 § 2.3.  PE Chicago cites no written agreement to contribute capital.  Thus under the terms of the partnership agreement, Panda Express had no duty to contribute additional capital.  Similarly, the Area Development Agreement that governed the development of Panda Express restaurants between 1997 and 2002 clearly stated that Panda Express had no duty to contribute capital, loan money to Rezko-Citadel, or facilitate other borrowing by Rezko-Citadel.  Def. Ex. 18 ¶ 2.3.  For these reasons, Panda Express did not violate a fiduciary duty by failing to invest more in the partnership.

PE Chicago also argues that Panda Express became the lender on PE Chicago's credit line and shut it down to starve the partnership of funds.  Plaintiffs provide no

33

evidence to support this assertion.  There is evidence that PE Chicago obtained funds

from MB and LaSalle Bank until 2002 and that after that, Panda Express took over the

debts and served as the sole source of funding to PE Chicago.  Pl. Ex. 28 at 3–4.  But

there is no indication that Panda Express acted wrongfully in acquiring the credit line or

breached a fiduciary duty by not loaning enough money to PE Chicago beyond PE

Chicago's bare assertion.  The same affidavit that provides evidence of the credit line

also states that (1) Panda Express had earlier agreed to subordinate its liens on PE

Chicago's partnership interest so that Rezko could obtain additional financing from MB

and LaSalle and (2) that Panda Express had guaranteed various loans from banks to

PE Chicago.  *Id.* at 3–4.  Given this evidence, no reasonable jury could conclude that

Panda Express attempted to shut Rezko-Citadel's sources of credit and starve it of

funds.

### 3.	Opening restaurants outside the partnership

PE Chicago also contends that Panda Express violated a fiduciary duty by

opening restaurants outside of the Rezko-Citadel partnership.  Panda Express argues

that this cannot be a violation of a fiduciary duty because it is specifically permitted by

the partnership agreement.  The agreement allowed either partner to engage in any

other activity or business they wished, including activities that competed with the

partnership.  Compl., Ex. 14 § 1.10(b).  The partnership agreement did not require that

a partner offer the partnership an interest or the opportunity to participate in any outside

business that the partner engaged in.  Given this contractual language and the fact that

under Illinois law, the limited partnership agreement could designate activities that do

not violate the partners' fiduciary duties, no reasonable jury could find that Panda

34

Express violated its fiduciary duties by opening other Panda Express restaurants outside of the partnership.

The Court grants summary judgment for defendants on all of PE Chicago's fiduciary duty claims.

## H.    Unjust enrichment

Sirazi contends that defendants took advantage of Rezko's difficult financial circumstances to purchase PE Chicago's interest in Rezko-Citadel at an unfair price and without regard for other stakeholders like him.  PE Chicago makes a similar claim as an alternative to its breach of contract claim and further contends that Panda Express cheated it out of its right to develop new Panda Express restaurants as part of the Rezko-Citadel partnership.

Defendants argue that this unjust enrichment claim must fail if the other claims fail because it is based on the same conduct as the other claims.  Illinois law, however, "appears to recognize unjust enrichment as an independent cause of action."  *Cleary v. Phillip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011).  "[I]f an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim—and, of course, unjust enrichment will stand or fall with the related claim."  *Id.* at 517.  Because the Court denies summary judgment on some of plaintiffs' other claims, summary judgment is not appropriate on the unjust enrichment claim.

Further, the unjust enrichment claims are independent of and broader than the other claims.  Although all of the claims concern the same transaction, the unjust enrichment claims challenge the circumstances of the sale generally, whereas other

35

claims challenge particular aspects. Similarly, PE Chicago's unjust enrichment claim is broader than its related breach of contract and fiduciary duty claims.

## I.      Promissory note

Defendant PRG argues that it is entitled to summary judgment on its claim against PE Chicago regarding the promissory note. PRG states that the remaining principal balance on the note is $825,000 and that, including interest and attorney's fees, PE Chicago owed $858,327.08 at the time PRG purchased the note from MB in December 2006. Def. Ex. 26. According to the terms of the note, interest on its has been accruing since its June 20, 2007 maturity date at five percent above MB's reference rate. Ans., Ex. A at 9–10. PE Chicago does not dispute that the note exists, that the total due on the note in December 2006 was $858,327.08, or that MB transferred the note to PRG and gave up its rights to any security interest in Rezko-Citadel.

PRG also asserts that it is entitled to attorney's fees on the note. The cited provision of the note, however, states only that the Rezko entities that signed a note extension agreement on June 20, 2006 "shall promptly reimburse the Bank for its legal fees incurred in connection with the loan extension and collateral release herein described." *Id.* at 10. This language refers only to attorney's fees that were actually incurred in the preparation of the 2006 note extension. It does not include legal fees for collection of the amount due on the note. PRG is entitled to collect only the principal and interest, plus attorney's fees related to the preparation of the note extension (if it has not already collected those fees).

PE Chicago makes six arguments in opposing entry of summary judgment on

this claim: (1) the proper valuation of the Rezko-Citadel partnership is disputed; (2) the sale price of PE Chicago's interest in Rezko-Citadel failed to include PE Chicago's $500,000 initial capital contribution; (3) PE Chicago should not remain liable on the note given the large amount of cash paid to Rezko personally; (4) the debt that PE Chicago owed to Panda Express was improperly attributed to it; (5) Panda Express agreed to assume the debt to MB as part of the purchase price and cannot now collect the balance of the note from PE Chicago; and (6) the doctrine of laches bars PRG's claim.

PE Chicago's first four arguments are unrelated to the enforceability of the note. These arguments attack the validity of the sale of PE Chicago's interest in Rezko-Citadel or the terms of that sale. But the note and the debt to MB existed before PE Chicago sold its interest, and the note was acquired by PRG after the sale in a separate, although related, transaction. Thus none of the four arguments provides a reason to deny summary judgment to PRG.

PE Chicago's fifth argument is that Panda Express agreed to assume the debt to MB when it purchased PE Chicago's interest. The initial financial terms of the deal included a payment of $1.825 million to MB which would have fully satisfied the debt. Pl. Resp., Ex. C. Subsequently, however, Panda Express determined that PE Chicago owed it more than it had previously thought. After accounting for this additional debt, the payment to MB was only $1,064,167. *Id.*, Exs. C & F; Compl., Ex. 19 at 1. Further, the amended sale contract stated that Panda Express would pay only $1,064,167 to MB. Compl., Ex. 19 at 1. The contract stated that Panda Express took PE Chicago's interest subject to MB's security interest but that this was "a mere financial accommodation" to Rezko and his companies and that they agreed to indemnify Panda

37

Express for any "cost or liability" associated with the security interest. *Id.* at 1–2. Thus the final terms of the deal did not include full payment of the MB debt.

PE Chicago argues that two statements by Panda Express officers reflect that Panda Express had agreed to assume the debt that PE Chicago owed to MB. In an e-mail sent in December 2006, Wilkinson, Panda Express's counsel, wrote that Panda Express had purchased PE Chicago's interest knowing that there was an unpaid balance and recommended that Panda Express pay off that balance. Pl. Resp., Ex. E at 1–2. In April 2007, Dan Sheehy, Panda Express's vice president and controller, wrote a letter to Panda Express auditors stating that Panda Express had paid the balance of the MB debt. *Id.*, Ex. F. Sheehy wrote that "[b]ecause this was a contingent liability that PRG assumed upon purchase of Mr. Rezko's interest, this amount will be recorded as additional consideration for the purchase of Mr. Rezko's fifty percent interest, bringing the total purchase price to $11,181,064." *Id.*

These statements, however, do not indicate that Panda Express gave up any ability to collect on PE Chicago's note to MB. They merely indicate that Panda Express recognized it had to pay off the note because MB had a lien that Panda Express wanted to terminate. Wilkinson also wrote in his e-mail that purchasing the note could "put an end to our long effort to get separated from [Rezko]." *Id.*, Ex. E at 2. At the time Sheehy wrote his letter, Panda Express may have counted the payment of the remaining balance to MB as part of the price of acquiring PE Chicago's interest because it did not think that it would be able to get Rezko or PE Chicago to pay it back as the sale contract required. As Panda Express states, before Sirazi took over PE Chicago, the company had no assets and was defunct. But Panda Express did obtain an

38

assignment of the note, and it retained the ability to collect on the note from the Rezko companies that had signed it.

In sum, the amended sale contract contemplated that part of PE Chicago's debt to MB would remain unpaid, and the e-mail from Wilkinson and letter from Sheehy indicate only that they thought that Panda Express would have to pay PE Chicago's debts because PE Chicago had no assets. The Court concludes that no reasonable jury could find that Panda Express agreed to assume the debt that PE Chicago owed on the note to MB.

PE Chicago's final argument is that the doctrine of laches bars PRG's counterclaim. "The application of laches in a particular case is dependent upon a showing of an unreasonable lack of diligence by the party against whom the defense is asserted and prejudice arising from this lack of diligence." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 822 (7th Cir. 1999). "A defendant has been prejudiced by a delay when the assertion of a claim available some time ago would be inequitable in light of the delay in bringing that claim and ensues when a defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed." *Id.* at 824.

No reasonable jury could find that PE Chicago suffered prejudice from any delay by PRG. PE Chicago states that had it known that PRG would one day seek to enforce the note against it, it would have demanded the release of any claim on the note before transferring its interest in Rezko-Citadel in June 2006. But PE Chicago signed a sale contract that specifically stated that it would indemnify Panda Express for any expenses associated with its assumption of the MB debt. This is the opposite of what PE Chicago now claims was its understanding at the time of sale. Compl., Ex. 19 at 1–2. PE

39

Chicago cannot claim that at the time of sale it did not expect to have to pay the balance of the note when the sale contract specifically required that it pay anything that Panda Express was required to pay on the note.

Additionally, no reasonable fact finder could find that PE Chicago's failure to demand a release of the claim at the time of sale was caused by any delay on the part of PRG.  PRG did not even have a claim based on the note until it was assigned the note by MB in December 2006.  This was months after PE Chicago had already agreed to indemnify Panda Express for any expenses related to the MB debt.  PE Chicago has offered no evidence of any way in which it changed its position in response to delay by PRG.

No reasonable fact finder could find that PE Chicago was not liable on the note or that any of PE Chicago's defenses excuse it from paying.  The Court grants summary judgment in favor of PRG on this claim.

## Conclusion

For the reasons stated above, the Court denies plaintiffs' motion for partial summary judgment [docket no. 208] and grants in part defendants' combined motion for summary judgment [docket no. 203].  Specifically, the Court grants summary judgment for defendants on the following claims:  in counts 2 and 3, PE Chicago's fraud and conspiracy to defraud claims; in count 5, PE Chicago's actual fraudulent transfer claim; in count 6, PE Chicago's constructive fraudulent transfer claim; in count 7, PE Chicago's breach of contract claim to the extent that it concerns the valuation of PE Chicago's interest in Rezko-Citadel; in Count 8, all claims.  The Court also grants summary judgment for PRG on its counterclaim.  The Court denies the remainder of defendants'

40

summary judgment motion. The case is set for a status hearing on December 19, 2011 at 9:30 a.m. Trial counsel are directed to appear, because it is likely that the Court will have to reset the currently scheduled trial date.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: December 13, 2011